1

2

3

4

5                       UNITED STATES DISTRICT COURT

6                        EASTERN DISTRICT OF CALIFORNIA

7

8    FREDDY ANTHONY MENDOZA, et          Case No. 1:20-cv-01393-KES-CDB
     al.,
9                                         FINDINGS AND RECOMMENDATIONS TO
                      Plaintiffs,         GRANT DEFENDANTS' MOTION FOR
10                                        SUMMARY JUDGMENT
          v.
11                                        (Doc. 89)
     RALPH DIAZ, et al.,
12                                        **14-DAY DEADLINE TO FILE
                      Defendants.         OBJECTIONS**
13

14

15          Pending before the Court is the motion for summary judgement by Defendants Rosemary

16   Ndoh ("Ndoh" or "Warden Ndoh") and Ralph Diaz ("Diaz" or "Secretary Diaz").  (Doc. 89).

17   Defendants contend the undisputed facts demonstrate that they are not liable for deliberate

18   indifference under the Eighth Amendment and are also immune from liability under the doctrine

19   of qualified immunity.  Plaintiffs Freddy Anthony Mendoza ("Mendoza") and Salvador Salazar

20   ("Salazar") filed an opposition to Defendants' motion on March 29, 2024 (Doc. 95).  Defendants

21   filed a reply on April 9, 2024.  (Doc. 96).  For the reasons set forth below, the undersigned

22   recommends that Defendants motion for summary judgment be granted.

23   **I.      Background**

24          **1.  The Inmate Attack at Avenal State Prison on September 29, 2018**

25          Plaintiff Mendoza was committed to the California Department of Corrections and

26   Rehabilitation ("CDCR") from January 14, 2016, to October 25, 2018, and was incarcerated at

27   Avenal State Prison ("ASP") from August 3, 2016, to November 17, 2018, when he was released

28   on parole.  (Doc. 96-2 Reply to Plaintiffs' Opposition to Defendants' Statement of Undisputed

1    Facts in Support of Defendants' Motion for Summary Judgment; "CSUF" No. 1); (Doc. 89-7

2    "Torres Decl." ¶4).[1]  Plaintiff Salazar was incarcerated at ASP from February 27, 2017, to

3    November 17, 2018, when he was released on parole.  (CSUF No. 2; Torres Decl. ¶5).  Plaintiffs

4    are associated with the Fresno Bulldogs ("Bulldogs"), a gang recognized by CDCR as a Security

5    Threat Group ("STG"). (Doc. 15 "First Amended Complaint" or "FAC" ¶7; CSUF Nos. 8-9).

6            On September 28, 2018, at around 10:30 a.m., ASP officials were informed that an

7    incident occurred at California State Prison, Corcoran ("Corcoran") where members of the

8    Bulldogs stabbed a high-ranking gang member ("shot caller") of the Sureños, a rival gang.  CSUF

9    No. 11 (citing Doc. 89-4 "Gutierrez Decl." ¶7).  On that same day, at approximately 6:00 p.m.,

10   the ASP Investigative Services Unit ("ISU") received credible information regarding a possible

11   threat on all Bulldog inmates in retaliation for the attack on the Sureños at Corcoran.  CSUF No.

12   12 (citing Gutierrez Decl. ¶8).  At approximately 9:15 p.m., the ASP ISU received information

13   from a Confidential Reliable Informant ("CRI") that the Sureños in housing units 510 and 550 at

14   ASP were planning to attack all Bulldogs on the prison yard on September 29, 2018, at around

15   9:00 to 9:15 a.m.  CSUF No. 13 (citing Gutierrez Decl. ¶9).  The CRI further stated that the

16   Sureños were obligated to use weapons in their attack.  *Id.*  Based on the information received

17   from the CRI, the ASP ISU also suspected that violence would erupt in Facilities E and F, since

18   they housed both Sureños and Bulldogs.  CSUF No. 14 (citing Gutierrez Decl. ¶10).

19           On September 28, 2018, J. Gutierrez, who was then employed as an institutional gang

20   investigator at ASP's ISU, contacted Paul Vera ("Vera"), ASP's chief deputy warden, regarding

21   the information ISU had received about the threat to the Bulldogs and whether this threat would

22   affect ASP.  *Id.* ¶1, 12.  Thereafter, Vera placed Facilities E and F in a "modified program" in

23   response to the reported threat.  *Id.* ¶12.[2]  Vera contacted Warden Ndoh by phone and informed

24           _____

25           [1] The CSUF is comprised of Defendants' Statement of Undisputed Facts (Doc. 89-2); Plaintiffs' objections (Doc. 95-1); and Defendants' reply to Plaintiffs' objections.  Unless

26   otherwise noted, the Court cites the CSUF herein where the parties do not dispute the referenced fact.

27           [2] While Plaintiffs do not dispute that ASP staff took "some measures" in response to the

28   information, they dispute Defendants' characterization of and terminology used in describing those measures.  (Doc. 95-1 ¶21).

her of the threat against the Bulldogs as well as his plan to place Facilities E and F on a modified program.  (Doc. 89-5 "Vera Decl." ⁋8).  Modified programs are enacted when correctional officers discover evidence or receive information that violence is being planned by some inmates against other inmates or correctional staff.  CSUF No. 22 (citing Vera Decl. ⁋7).  Modified programs may suspend certain prison functions like work and education programs, visits, dayroom privileges, and outdoor yard time.  *Id*.

According to Vera, Warden Ndoh was away from ASP on September 28 and 29, 2018, and he was the acting warden during this timeframe.  Vera Decl. ⁋3.  As a general matter, Vera sought out Ndoh's approval before implementing decisions and all decisions made by Vera were subject to the Ndoh's approval.  (Doc. 78-1, Exhibit C "Ndoh Depo." pp. 19-20; 21-22).

On September 29, 2018, at around 9:12 a.m., the Sureños commenced a coordinated attack on the Bulldogs at ASP housing units 630, 610, 510, and 530.  (Doc. 89-6 "Diaz Decl." ⁋3).  The Sureños attacked the Bulldogs with various makeshift weapons, including shivs and padlocks-in-socks ("saps").  (FAC ⁋⁋ 1,7, 27-28, 49).  Plaintiffs Mendoza and Salazar were incarcerated in Facility F, Housing Unit 610, Dorm 20 at the time of the attack.  (CSUF Nos. 1-2).

During the attack, Plaintiff Salazar received multiple stab wounds on his head.  (Doc. 95-2, Exhibit J p. 70).  Plaintiff Salazar needed to be put in a stretcher and flown to a hospital via helicopter.  *Id*.  Plaintiff Mendoza recalls getting kicked, punched, and stabbed. (Doc. 95-2, Exhibit M p. 59).  Plaintiff Mendoza recalls being covered in blood from head to toe and being taken in an ambulance.  *Id*.  According to the FAC, the attack continued for approximately 20-30 minutes.  FAC ⁋8.  The FAC alleges that 180 inmates affiliated with the Sureños and another STG known as the Mexican Mafia ("EME") attacked Plaintiffs' group, which is estimated to be comprised of 18 Bulldogs. *Id*. ⁋49.

Plaintiffs allege Defendants disregarded the substantial risk of harm facing them when Defendants failed to take reasonable measures to protect them from the attack. FAC ⁋⁋69-70.  Plaintiffs contend that reasonable defensive measures were known and available to Defendants, but they nevertheless did not take those steps without any reasonable justification.  *Id*.  For example, Defendants failed to segregate Plaintiffs from other groups upon learning of the danger,

1    maintained Plaintiffs at the same location of their attackers, failed to allocate sufficient guards at

2    Facilities E and F, and failed to take preventative measures such as putting a gunner in the blocks.

3    *Id*. ¶68.  Plaintiffs contend that those were common-sense measures that were previously

4    implemented in similar situations.  *Id*. ¶69.

5            Plaintiffs initiated this action with the filing of their complaint on September 28, 2020.

6    (Doc. 1).  Under the operative FAC, Plaintiffs asserted four causes of action: (1) Deliberate

7    Indifference and Failure to Protect under 42 U.S.C. § 1983; (2) Conspiracy to Deprive Plaintiffs

8    the Equal Protection of the Laws under 42 U.S.C 1985(3); (3) Neglect to Prevent Interference

9    with Civil Rights under 42 U.S.C. § 1986; and (4) Negligence.  (FAC ¶¶ 64-96).  On April 8,

10   2022, the Court granted Defendants' motion to dismiss in part.  (Doc. 26).  Plaintiffs' claims

11   against Defendants in their official capacities were dismissed without leave to amend.  *Id*. at 16.

12   Plaintiffs' state law negligence claim, §1985(3) claim, and §1986 claim against Defendants in

13   their individual capacities were dismissed with leave to file an amended complaint within 21

14   days.  *Id*. at 16-17.  Plaintiffs filed no amended complaint, and thus have elected to proceed

15   against Defendants Diaz and Ndoh only on their Section 1983 deliberate indifference – failure to

16   protect claim.[3]

17       **2. The Defendants**

18           Defendant Ralph Diaz served as the acting secretary of CDCR from September 1, 2018, to

19   March 27, 2019. (Doc. 89-8 "Diaz Decl." ¶1).  On March 27, 2019, Defendant Diaz was

20   appointed as the Secretary of CDCR, a position which he held until October 2020, when he

21   retired.  *Id*.  As secretary of CDCR, Defendant Diaz was responsible of state statewide operations

22   for CDCR.  *Id*. ¶2.  Defendant Diaz's duties included holding regular meetings with executive

23   staff and directors to be briefed on major program and organizational issues of CDCR.  Defendant

24   Diaz would meet with prison wardens and other staff each month. *Id*.

25

26           [3] On September 5, 2023, the Court dismissed Plaintiffs John Melendez, Justice Dillon
     Pajarillo, Jose Canales, Jr., Pedro Castro, Emerson Gaitan, Carlos Espinoza, Eric Hernandez, and
27   Daniel Garcia for their failure to exhaust administrative remedies. (Doc. 80).  Plaintiffs
     Alejandrino Manjaraz and Phillip Bernard were dismissed on the parties' stipulation pursuant to
28   Fed. R. Civ. P. 41(a)(1)(A)(ii).  (Doc. 74).

1       According to Defendant Diaz, his duties and responsibilities as Secretary of CDCR did

2   not include providing oversight of a warden at a particular prison within CDCR, including how to

3   respond to threats posed to inmates by STGs.  Instead, the wardens and their managerial staff

4   conducted regular meetings to address day-to-day operations, including how to respond to threats

5   of violence.  *Id*. ¶3.  Likewise, Defendant Diaz's responsibilities did not involve monitoring gang

6   activity or rival gang friction within CDCR's prisons, as these activities are handled by each

7   institutions' ISU, the Office of Correctional Safety, the Director of the Division of Adult

8   Institutions, and the associate director.  *Id*.  Nevertheless, Diaz did receive investigative reports

9   from investigative units about high-level gang members when sufficiently serious threats were

10  discovered.  (CSUF No. 4).

11      CDCR facilities in 2018 produced daily activity reports that are forwarded the

12  "headquarters mission" and which are "rolled up into a departmental activity report ["DAR"],

13  which is sent out via email to institutions to give them . . . a snapshot of what's going on"

14  between prisons.  CSUF Nos. 4, 5. Those DARs were circulated every day around 5:00 p.m.  *Id.*

15      Defendant Rosemary Ndoh worked for CDCR for over 25 years and was the warden of

16  ASP at the time of the attack against Plaintiffs.  CSUF No. 7.  Ndoh was not present at ASP at the

17  time of the incident or the day prior.  CSUF No. 18.[4]  Instead, Chief Deputy Warden Vera was

18  managing ASP on her behalf.  CSUF No. 19.  Defendant Ndoh formerly served as a chief deputy

19  warden and is familiar with that position.  Ndoh Depo. p. 18.  The chief deputy warden has

20  significant authority over a prison, including oversight of appeals, grievances and prisoner

21  classifications, management of prison programs, conduct of meetings, and control over prison

22  incidents.  *Id*.

23      The prison warden ultimately makes all the decisions in a prison.  *Id*. p. 19.  The chief

24  deputy warden would consistently look to the warden for input and ratification of his decisions.

25  *Id*.  If a chief deputy warden wanted to implement his decisions, the warden would either ratify

26  those decisions or correct them if she thought they were wrong.  *Id*.  The chief deputy warden's

27  _____

28      [4] While Plaintiffs dispute the reason for Ndoh's absence, they do not dispute she was, in
    fact, not present at ASP during the attack.

decisions are subject to final approval by the warden.  *Id*. p. 22.

## II.     Standard of Law

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).

Each party's position must be supported by: (1) citing to particular portions of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  *See* Fed. R. Civ. P. 56(c)(1).  The court may consider other materials in the record not cited to by the parties, but it is not required to do so.  *See* Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (on summary judgment, "the court has discretion in appropriate circumstances to consider other materials, [but] it need not do so"). Furthermore, "[a]t summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial."  *Nevada Dep't of Corr. v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) (citations and internal quotations omitted).  The focus is on the admissibility of the evidence's contents rather than its form.  *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004).

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,

210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party meets this initial burden, the burden then shifts to the non-moving party "to designate specific facts demonstrating the existence of genuine issues for trial."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Celotex Corp., 477 U.S. at 323*).  The non-moving party must "show more than the mere existence of a scintilla of evidence."  *Id.* (citing *Anderson,* 477 U.S. at 252).  However, the non-moving party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Electrical Serv., Inc. v. Pac. Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).

The court must apply standards consistent with Rule 56 to determine whether the moving party has demonstrated the absence of any genuine issue of material fact and that judgment is appropriate as a matter of law.  *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  "[A] court ruling on a motion for summary judgment may not engage in credibility determinations or the weighing of evidence."  *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted).  The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**II.     Discussion**

**1. Evidentiary Objections**

Plaintiffs filed a statement in opposition to Defendants' Statement of Undisputed Facts in support of their motion for summary judgment.  (Doc. 95-1).  Plaintiffs' opposition is comprised of various points of disputed facts with relevant citations.  The undersigned will address the parties' disputed issues of fact as necessary in tandem with discussion of the relevant points of argument below.

Plaintiffs' opposition also presents evidentiary objections to many of Defendants' proffered undisputed facts as vague, misleading, or irrelevant.  *See id*.  A party may "object that the material cited to support or dispute a fact *cannot be presented* in a form that would be

admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). "At the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). *Accord*, *Nevada Dep't of Corr.*, 648 F.3d at 1019; *Carmen*, 237 F.3d at 1031.  Thus, "when evidence is not presented in an admissible form in the context of a motion for summary judgment, *but it may be presented in an admissible form at trial,* a court may still consider that evidence." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp.2d 1110, 1120 (E.D. Cal. 2006) (emphasis in original) (citing *Fraser*, 342 F.3d at 1037).

Plaintiffs specifically object to approximately 18 of Defendants' proffered statements of undisputed fact, largely on vagueness and relevance grounds.  *See* CSFU Nos. 4, 5, 6, 16, 20, 21, 22, 25, 26, 37-45.  These types of objections are the quintessential type for which, "[i]nstead of *objecting,* parties should simply *argue* that the facts are not material." *Burch*, 433 F. Supp.2d at 1119-20.  As an example, Plaintiffs object on relevance grounds to Defendants' proffer as an undisputed fact that CDCR and its individual prisons have preexisting response plans to facilitate quelling large-scale incidents while minimizing injuries to suspected participants.  CSUF No. 37. The existence of response plans plainly is relevant to allegations that prison officials were deliberately indifferent in the face of an inmate uprising like that at issue in this case.  Indeed, as they do with virtually all of the undisputed facts for which they assert relevance objections, Plaintiffs undermine the basis of their objection by coupling it with an argumentative statement of dispute and citations to record evidence for arguably inconsistent facts.  *See Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) ("if evidence submitted on summary judgment could create a genuine dispute of material fact, it is, by definition, 'of consequence in determining the action,' and therefore relevant .... Conversely, if the submitted evidence does not create a genuine dispute of material fact, there is no need for the court to separately determine whether it is relevant because, even assuming it is not, it will not affect the ultimate summary judgment ruling.").  Given that relevance is broadly defined and generally presents a low threshold for admissibility and given that Plaintiffs' relevance objections are more akin to arguments attacking the materiality of the proffered assertion, the undersigned rejects all of Plaintiffs' relevance

1   objections.  The objections are pertinent, if at all, to the weight of the fact asserted.

2          To take one example of Plaintiffs' vagueness objections, Defendants proffer as an

3   undisputed fact that Defendant Diaz "did not have any knowledge" of the attack at ASP until after

4   it was quelled.  CSUF No. 5.  Plaintiffs argue the assertion is vague because it is unclear whether

5   Defendant Diaz denies knowing about the ASP attack, or about a prior threat of a riot, or of

6   possible violence in general.  *Id.*  First, the undersigned disagrees the proffered fact is vague – the

7   assertion about Defendant Diaz's knowledge of the ASP attack plainly is limited to the actual

8   attack, not circumstances leading up to the attack or violence in general.  Second, whatever

9   vagueness is presented in the statement as written, the undersigned is sufficiently confident that

10  Defendants could present at trial an admissible form of the fact to conclude for the purposes of

11  Defendants' summary judgment motion that Defendants' vagueness objection is without merit.

12  *See* Fed. R. Civ. P. 56(c)(2) (party may "object that the material cited to support or dispute a

13  fact *cannot be presented* in a form that would be admissible in evidence") (emphasis added);

14  *Burch*, 433 F. Supp.2d at 1120.  The undersigned likewise overrules Plaintiffs' other vagueness

15  objections on the same grounds.

16          **2.  Deliberate Indifference**

17                  **A.  Standard of Law**

18          "The Eighth Amendment imposes a duty on prison officials to protect inmates from

19  violence at the hands of other inmates."  *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015).  In

20  order to prevail on an Eighth Amendment claim, a prisoner must show that prison officials were

21  deliberately indifferent to a substantial risk of harm to his health or safety.  *Farmer v. Brennan*,

22  511 U.S. 825, 847 (1994).  "Deliberate indifference" has both subjective and objective

23  components, meaning that objectively, the prison conditions posed a risk of serious harm, and

24  subjectively, a prison official must "be aware of facts from which the inference could be drawn

25  that a substantial risk of serious harm exists, and . . . must also draw the inference."  *Id.* at 837;

26  *Labatad v. Corrections Corp. of America*, 714 F.3d 1155, 1160 (9th Cir. 2013).  "Deliberate

27  indifference is a high legal standard."  *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). A

28  prison official is liable only when the official "knows that inmates face a substantial risk of

serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

A jury may "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. For instance, if the "plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 842-43 (internal quotations omitted). Liability for deliberate indifference may not be premised on constructive notice, but prison officials cannot ignore obvious dangers to inmates. *Id.* at 842.

A defendant may only be held liable as a supervisor under Section 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks and citation omitted); *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418 (9th Cir. 2003). A supervisor may be liable for her "own culpable action or inaction in the training, supervision, or control of his subordinates"; for her "acquiescence in the constitutional deprivations"; or for "conduct that showed a reckless or callous indifference to the rights of others." *Id*. at 1205-05; *Lemire v. Cal. Dept' of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).

**B. Discussion**

Defendant Diaz argues that he was not deliberately indifferent because he received no notice of the attack or otherwise was involved in the incident in any way. (Doc. 89 p. 12). Plaintiffs argue that Defendant Diaz monitored, or at least, received information about high-level gang members from the office of correctional safety while he was Secretary. (Doc. 95 p. 7). Plaintiffs further argue that since part of Diaz's responsibilities included monitoring gang activity, receiving reports about high-ranking gang members, and receiving daily snapshots of activity in each of the prisons, which were circulated to the wardens in the CDCR system at approximately

5:00 p.m., he must have known in advance about the imminent danger from the Sureño attack at ASP. *Id.* pp. 7-8.

A prison official's knowledge of a substantial risk of harm may be demonstrated by inferences drawn from circumstantial evidence. *Farmer*, 511 U.S. at 842. Thus, for instance, were a plaintiff to present evidence showing that the substantial risk of an attack was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" and the defendant official "must have known" about it, this evidence may be sufficient to defeat summary judgment. *Id.* at 842-43.

Here, although Plaintiffs point to Defendant Diaz's general responsibilities as Secretary to monitor the affairs of high-ranking gang members and that under certain circumstances, the severity of gang-related issues might be elevated to him (Doc. 95 p. 7), there is no record evidence that Defendant Diaz did, in fact, monitor the developments related to the antecedent stabbing of the Sureño shot caller by the Bulldogs at a close-by CDCR facility. Likewise, there is no evidence that Defendant Diaz was aware of impending retaliation against the Bulldogs at ASP, particularly given his undisputed deposition testimony that this type of information pertaining to the safety of an individual prison typically would be addressed by the warden or escalated to that prison's respective mission. Because Plaintiffs have not identified "specific facts demonstrating the existence of genuine issues for trial" concerning Defendant Diaz's awareness of circumstances posing a risk of serious harm to Plaintiffs, or that Defendant Diaz otherwise "must have known" about this risk, summary judgment is warranted. *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387.

As for Defendant Ndoh, Defendants argue she was not deliberately indifferent because, on the day of the ASP attack, "she was on leave and ASP's Chief Deputy Warden P. Vera was the acting warden during the relevant time period." (Doc. 89 p. 12). However, Ndoh's physical location is not determinative of whether, for purposes of the deliberate indifference analysis, she could be aware of facts from which she could infer that an impending attack at ASP presented a substantial risk of serious harm to Plaintiffs. *Farmer*, 511 U.S. at 837. Indeed, Defendants concede that Chief Deputy Warden Vera contacted Warden Ndoh by phone during the evening

1   preceding the attack, informed her of the reported threat against the Fresno Bulldogs, and

2   reported implementation of a modified program at Facilities E and F.  Ndoh Decl. ¶5; Vera Decl.

3   ¶6.  In addition, Ndoh testified that, as a general matter, Vera sought her approval before

4   implementing decisions and that all decisions made by Vera were subject to her approval.  Ndoh

5   Depo. p. 19-20; 21-22.  Accordingly, given Vera's report to Ndoh about the impending attack the

6   evening prior and Ndoh's assertion that, in general, Vera required her approval prior to

7   implementing action, the undersigned finds there are disputed issues of material fact concerning

8   Defendant Ndoh's awareness of circumstances posing a risk of serious harm to Plaintiffs.

9      But that is not enough for Plaintiffs to defeat Defendants' motion for summary judgment.

10   In addition to demonstrating a prison official knows that inmates face a substantial risk of serious

11   harm, a plaintiff alleging deliberate indifference must also establish that the official

12   "disregard[ed] that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at

13   847.  Here, while there is no dispute that prison staff responded to threat information received in

14   advance of and predicting the ASP attack by taking some prophylactic measures – such as placing

15   the targeted housing units in modified programing – the parties disagree about the sufficiency of

16   ASP officials' protective measures, relying in part on their respective expert witnesses who come

17   to different conclusions.  *Cf.* (Doc. 89 p. 12 and Doc. 96 pp. 8-9 *with* Doc. 95 pp. 10, 16).

18   However, as explained below, even if Warden Ndoh knew about *and* acted unreasonably in the

19   face of the risk of serious harm posed by the impending attack, she nevertheless would be entitled

20   to qualified immunity.  *See Hines v. Youseff*, 914 F.3d 1218, 1239 (9th. Cir. 2019) ("The courts

21   below did not decide whether exposing inmates to a heightened risk of Valley Fever violates the

22   Eighth Amendment.  Neither do we. Instead, we go straight to the second prong of the qualified

23   immunity analysis").

24      **3.  Qualified Immunity**

25         **A.  Standard of Law**

26      "The doctrine of qualified immunity protects government officials 'from liability for civil

27   damages insofar as their conduct does not violate clearly established or constitutional rights of

28   which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

1  (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two

2  important interests — the need to hold public official accountable when they exercise power

3  irresponsibly and the need to shield officials from harassment, distraction, and liability when they

4  perform their duties reasonably." *Id*.  The doctrine is intended to "give[] government officials

5  breathing room to make reasonable but mistaken judgments about open legal questions."

6  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

7      "The protection of qualified immunity applies regardless of whether the government

8  official's error is 'a mistake a law, a mistake of fact, or a mistake based on mixed questions of

9  law and fact.'" *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)

10  (Kennedy, J., dissenting)).  "[T]he 'clearly established' inquiry is a question of law that only a

11  judge can decide." *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017).

12      In determining whether a prison official is entitled to qualified immunity, the Court

13  decides (1) whether facts alleged or shown by plaintiff make out a violation of constitutional

14  right; and (2) whether that right was clearly established at the time of the officer's alleged

15  misconduct. *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 553 U.S. 194, 201 (2001)).  A

16  plaintiff must prove both steps of the inquiry to establish the official is not entitled to qualified

17  immunity. *Felarca v. Birgeneau*, 891 F.3d 809, 815 (9th Cir. 2018) (citation omitted).[5]  The

18  Court has discretion to decide which prong of qualified immunity to address first given the

19  circumstances of the case and, if one prong is dispositive, the Court need not examine the other

20  prong. *Pearson*, 555 U.S. at 236.

21      **B. Discussion – "Clearly Established"**

22      "To be clearly established, a legal principle must have a sufficiently clear foundation in

23  then-existing precedent," as shown in "controlling authority or a robust consensus of cases of

24  persuasive authority." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citations omitted);

25  *see Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) ("Plaintiffs must point to prior

26  case law that articulates a constitutional rule specific enough to alert these deputies in this case

27

28      [5] Thus, Plaintiffs are mistaken in arguing that "defendants' [*sic*] have failed to meet their
burden with respect to qualified immunity."  (Doc. 95 p. 11).

that their particular conduct was unlawful") (emphasis removed).  The Supreme Court has held

that the law "does not require a case directly on point for a right to be clearly established, [but]

existing precedent must have placed the statutory or constitutional question beyond debate."

*White v. Pauly*, 580 U.S. 73, 79 (2017) (quotations and citations omitted); accord *Rico v. Ducart*,

980 F.3d 1292, 1298 (9th Cir. 2020) (citing *Ashcroft*, 563 U.S. at 741).

When examining whether the right at issue has been clearly established, the court may not

"define clearly established law at a high level of generality."  *Kisela v. Hughes*, 584 U.S. 100, 104

(2018) (quoting *Ashcroft*, 563 U.S. at 742).  Instead, "the clearly established law at issue must be

particularized to the facts of the case."  *White*, 580 U.S. at 79 (quotations and citations omitted).

The plaintiff bears the burden of "proving that the right allegedly violated was clearly established

at the time of the official's allegedly impermissible conduct."  *Camarillo v. McCarthy*, 998 F.2d

638, 639 (9th Cir. 1993); *see* p. 13 & n.5, *supra*. Officials are subject to suit only for actions that

they knew or should have known violated the law.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002);

accord *Hines*, 914 F.3d at 1230-21 (to defeat qualified immunity, inmate-plaintiffs "must show

that no reasonable officer could have thought that free society tolerated that risk" resulting in the

plaintiffs' injuries).  The law is also "clearly established" for the purposes of qualified immunity

if "every reasonable official would have understood that what he is doing violates th[e] right" at

issue.  *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (per curiam) (quotation marks omitted).  *Cf.*

*Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (right is clearly established

when case law has been "earlier developed in such a concrete and factually defined context to

make it obvious to all reasonable government actors, in the defendant's place, that what he is

doing violates federal law") (citing *White*, 580 U.S. at 79).

As applied here, the Court first defines the right(s) at issue.  Plaintiffs make little attempt

to define for the Court the right relevant to the qualified immunity analysis other than to argue

generally that "the contours" of deliberate indifference law "were sufficiently clear that

Defendants knew that they had a duty to keep Plaintiffs safe from harm."  (Doc. 95 p. 15).  But

that impermissibly casts the relevant law at too high a level of generality and without

consideration of the particularized facts of the case.  *Kisela*, 584 U.S. at 104; *White*, 580 U.S. at

79.  *Cf. Hamby v. Hammond*, 821 F.3d 1085, 1090-91, 1094 (9th Cir. 2016) (clarifying that the right at issue must not be defined "at too high a level of generality," such as "the right not to be treated with deliberate indifference to a serious medical need ....").

In *King v. Riley* (76 F.4th 259 (4th Cir. 2023)), the Fourth Circuit addressed qualified immunity in the context of a plaintiff-inmate's failure to protect claim against a correctional officer.  In that case, the estate of a deceased inmate asserted that a correctional officer at the facility housing the decedent and who was aware the decedent faced a risk of serious harm from inmate violence in his cell was deliberately indifferent because, during his periodic security check when the decedent was being attacked, the officer walked past plaintiff's cell without looking inside.  *Id.* at 264.  The Court explained that the inmate's right at issue was "to have a correctional officer look into the cell window while conducting a security check – given a known and substantial risk of inmate-on-inmate violence in the Unit."  *Id.* at 266.  The Court elaborated that "even if the risk of inmate violence was substantial and [defendant] knew that – [the inmate] needs precedent establishing that [defendant's] efforts to mitigate that risk (i.e., security checks without looking in cells) were constitutionally deficient."  *Id.*  In other words, the correctional officer was entitled to qualified immunity if there was no clearly established right to properly conducted security checks.  *Id.* at 264.

Similar to the plaintiff in *King*, Plaintiffs assert their failure to protect claims are "grounded" in the "sufficiency of the specific measures taken and not taken [by Defendants] when Plaintiffs suffered life-threatening injuries from a forewarned, identified, and credible threat."  (Doc. 95 p. 11).  They specifically challenge ASP prison officials' failure to search for and confiscate weapons (*id.* p. 15) and rely on a report of an expert witness challenging the adequacy of protective measures implemented.  *Id.* p. 10.  The expert witness opined, among other things, that ASP prison officials could have better protected inmates by restricting them to their bunks and/or handcuffing them (Doc. 95-1 ¶¶38, 42, 44) and by manning a gun post (*id.* ¶44).

Based on Plaintiffs' characterization of their claims and theory of liability, to defeat Defendants' asserted entitlement to qualified immunity, Plaintiffs must identify "clearly

1   established" authority that Defendants' failure to take actions apart from implementation of a

2   modified program in the affected cell blocks – such as undertaking the protective measures

3   identified above – amounts to a deliberately indifferent failure to protect.  *E.g.*, *Hamby*, 821 F.3d

4   at 1091 ("existing precedent must have placed beyond debate the unconstitutionality of the

5   officials' actions, as those actions unfolded in the specific context of the case at hand.").

6   Plaintiffs have not identified any Supreme Court or Ninth Circuit decision holding officers (or a

7   warden) liable for conduct similar to the alleged actions and omissions of the Defendants here.

8          In their opposition brief addressing Defendants' arguments on qualified immunity,

9   Plaintiffs' only serious attempt to identify and analogize to binding precedent implicating

10  purportedly "clearly established" authority governing failure-to-protect claims involves a single

11  Ninth Circuit case (*Castro v. Cnty. of Los Angeles*, discussed *infra*).  *See* (Doc. 95 pp. 11-16).

12  The undersigned declines to address the lower court or out-of-Circuit authorities cited by

13  Plaintiffs, which in any event are plainly inapplicable to the qualified immunity analysis here.

14  *See id.* (citing *inter alia Castillo v. Solano Cnty. Jail*, No. 2:08-cv-3080 GEB KJN P, 2011 WL

15  3584318, at *13 (E.D. Cal. Aug. 12, 2022), *report and recommendation adopted*, 2011 WL

16  3911043 (E.D. Cal. Sept. 6, 2011) (involving claims of deliberate indifference to plaintiff's

17  contraction of scabies and staph infection)).

18         In *Castro*, a pretrial detainee claimed that defendant-correctional officers and others were

19  deliberately indifferent to the substantial risk of harm created by housing plaintiff in the same

20  sobering cell as another arrestee and failing to maintain appropriate supervision of his cell. 797

21  F.3d 654, 664 (9th Cir. 2015), *aff'd in rel. part en banc*, 833 F.3d 1060 (9th Cir. 2016).  Shortly

22  after the arrestee was placed in the sobering cell, the plaintiff pounded on a window for a full

23  minute to get correctional staff's attention.  20 minutes later, a community volunteer notified the

24  supervising correctional officer that the arrestee was inappropriately touching the plaintiff, but the

25  supervisor did not investigate. Shortly afterwards, the arrestee violently attacked and injured the

26  plaintiff.  The district court rejected the officers' qualified immunity defense, reasoning that

27  "a jury could find that placing an actively belligerent inmate in an unmonitored cell with [the

28  plaintiff] constituted deliberate indifference to a substantial risk of harm."  *Id.* at 662.  The Ninth

Circuit affirmed, noting that "*Farmer* sets forth the contours of the right to be free from violence at the hands of other inmates with sufficient clarity to guide a reasonable officer." *Id.* at 664.

The facts and circumstances of *Castro* are starkly distinct from the instant case.  There, officers created the circumstances leading to the plaintiff's ultimate injuries and failed to take *any action* when alerted to the possibility of danger by the plaintiff.  Here, after corrections staff learned of a possible threat from rival gang inmates against Bulldog inmates at ASP, they placed the facilities housing Bulldog inmates on a modified program, limiting inmate movement and confining the inmates to their housing units.  CSUF Nos. 21, 22.  Unlike the plaintiff in *Castro* who attempted to alert corrections staff to the danger he perceived, neither Plaintiff Mendoza nor Plaintiff Salazar had advanced notice of the impending attack aside from the information shared with them by corrections officers – thus, they did not unsuccessfully solicit assistance from corrections officers like the plaintiff in *Castro*.  (Doc. 95-2 "Mendoza Depo" p. 59; Doc. 89-3 pp. 19-20, 67-68).[6]

At bottom, Plaintiffs fail to cite binding authority that the actions taken by ASP's corrections staff to protect Bulldog inmates in light of the threat information received was unreasonable or amounted to deliberate indifference.  Because they have not shown Defendants failed to "take reasonable measures," Defendants are entitled to qualified immunity.  *Farmer*, 511 U.S. at 847.  *See Leonard v. Peters*, No. 21-35471, 2023 WL 387035, at *3 (9th Cir. Jan. 10, 2023) (granting summary judgment to correctional officer on plaintiff's failure-to-protect claim based on qualified immunity grounds) (citing *Castro*, 833 F.3d at 1067).

Finding Defendants entitled to qualified immunity is consistent with the Supreme Court's general guidance that prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  "That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline." *Whitley v. Albers*,

---

[6] The Court's references herein to Doc. 89-3 cite the pagination provided by CM/ECF.

1   475 U.S. 312, 322 (1986).  As set forth above, while a corrections officer may not be entitled to

2   qualified immunity for affirmatively placing an inmate at risk of harm and failing to investigate

3   the inmate's reporting of danger (*see Castro*, *supra*), those are not the circumstances present here.

4   Because Plaintiffs fail to carry their burden of identifying binding precedent making it "obvious"

5   to "all reasonable government actors, in the defendant's place, that what he is doing violates

6   federal law," Defendants are entitled to qualified immunity.  *Shafer*, 868 F.3d at 1117.

7   **IV.    Conclusion and Recommendations**

8         For the foregoing reasons, the undersigned **HEREBY RECOMMENDS** that Defendants'

9   Motion for Summary Judgment (Doc. 89) be granted.

10        These findings and recommendations are submitted to the district judge assigned to this

11  action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fourteen

12  (14) days of service of this recommendation, any party may file written objections to these

13  findings and recommendations with the Court and serve a copy on all parties.  Such a document

14  should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The

15  district judge will review the magistrate judge's findings and recommendations pursuant to 28

16  U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified

17  time may waive the right to appeal the district judge's order.  *Wilkerson v. Wheeler*, 772 F.3d

18  834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

19  IT IS SO ORDERED.

20     Dated:   **July 2, 2024**

21                                            UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28

18